2938, Raritan Baykeeper, Inc. v. New York State Department of Environmental Conservation. Ms. Cram. Good morning, Your Honors. May it please the Court. My name is Susan Cram, and I am here on behalf of the petitioners. New York Department of Environmental Conservation, which I may refer to as DEC to make it easier, has twice made a substantive determination that Transco's proposal to dig a 17-mile-long trench through the contaminated seafloor of New York Harbor could not be done without violating water quality standards. The exact same company now has proposed the exact same project, but somehow this time DEC reached the opposite conclusion. In the intervening years, the politics around the project may have changed. I'm saying somehow they reached the opposite conclusion, but they realized that they had rejected it before, and they said that this time they got the extra information they needed to make a determination that the project could be done consistent with the water quality standards. I mean, nobody disputes that they made a different decision. The agency itself explains why it was made a different decision. They did make a different decision, and there are two significant concerns that I'd like to focus on today that are problematic about that decision. The first is that in order to reach their conclusion that the project would comply with New York's water quality standards, they relied on future plans, the details of which are not provided, and they have not made available for public review the specifics of the terms of those plans that the agency itself acknowledges are critical to whether or not the project will assure compliance. You said that they didn't provide the details, but they do provide a lot of details about what it's going to do, right? So the dredge management plan needs to describe the methods and equipment and specifications of the dredging, needs to describe the measures they're taking to maintain that the equipment remains in good operating condition, describe how they're going to dispose of the dredge materials, and there's a whole list of everything it needs to explain. So it's a pretty detailed thing, and then the agency is going to approve the management plan in particular. So I'm not sure that it's true that we don't know what it's going to say, but then also because it's sort of about using the best equipment and making sure you monitor. It does seem like the agency is basically saying, okay, given what we expect the project to do, it's approvable, and we're going to make sure you have the best equipment and some safeguards to make sure that nothing unexpected happens. Why is that arbitrary for the agency to set it up that way? Well, so let me answer that in a few different ways. Let me start by saying that the dredge management plan is one of several plans, and the dredge management plan is not required to be reviewed and approved by DEP. In the text of the water quality certification, it says only that Transco needs to submit the plan. It does not require review and approval the way the other plans do, and that's significant here because the dredge management, it's at 837, the dredge management plan is in fact the most significant of these plans. Dredging is the main source of sediment disturbance and pollutant resuspension. Okay, but what difference does it make about whether there's an approval? I mean, so if I look at this, it's a whole list of you need to describe this, you need to describe this, you need to describe this, you need to describe this. You can call it a dredge management plan. It also might be described as like a set of interrogatories to the company to explain all of the different things. So again, I think... If they don't give that information to the agency, then the agency might respond by saying it's incomplete, but I don't... So a couple of things. The statute here requires that in advance of issuing the certification, the agency can assure, that the project can assure compliance with the water quality standards. And what the statute says is that if there are conditions in order for the project to comply with water quality standards, those conditions need to be included in the certificate. Now the conditions required to assure compliance are not give us a plan of what you're going to do later. The conditions are the specifics, the operational measures like the dredging rates, like the measures for compliance as in Waterkeeper where the nutrient management plan held the key operational specifics that would allow... There's always going to be something that happens. You don't disagree that the agency could say we want continuous monitoring of the water quality and if something unexpected happens, maybe we will change what we're doing in the middle, right? No. So there's always going to be something that is left to the implementation phase. And so the question is just whether this is so crucial that you couldn't approve the plan...  ...before implementing it, right? That's correct, Your Honor. And there are two problems here. One is that these plans are so crucial. And the other is that the case law under the Clean Water Act as well as many other administrative decisions show that in order for the public participation requirement to be satisfied, that the public have notice and information about the basis for the agency's decision. And here they didn't because the... Well, that's not really what the statute says. The statute says that there needs to be public notice of an application, right, for a permit. And the New York State regulations say that when the application is complete, that's when the public is notified and there's some kind of a hearing and then you take public comment, right? But there is a provision for like a subsequent hearing when the agency, you know, asks for more information and so on as part of its review. So 1251 of the Clean Water Act requires public participation in the development of effluence limitations, other limitations, and that has been read to require both in Waterkeeper and in Citizens for a Better Environment to be seen as a requirement that the public have access to the information on which the agency relies for its permitting decisions under the 402 program, under the 404 program. And so in Waterkeeper, it was a 402 case, but the court looked specifically to 1251, which is the provision that requires public participation. And let me turn just briefly to the state regulation. It is true, Your Honor, that the state regulations require public notice when the application is complete. And I have two things to say about that. One is that this is the state acting under a federal program, and so the Clean Water Act requirements apply as well to this facility. And to the extent that the state regulations do not satisfy the Clean Water Act's requirements for public participation, those are true. But why would the New York state requirements not satisfy it? So the federal statute says there needs to be public notice of an application and some provision for public hearing to the extent the state deems appropriate. So the state has a lot of discretion as to how much input it's going to get from the public. And the New York state regulations provide notice of the application once it's complete, so you see the entire application, and then has a hearing about it, right? Well, there was no hearing here, but with respect to the complete application, DEC determined that this— There's public comment, right?  So that's a type of hearing. So DEC determined that this application was complete before it had all of the significant information on which it based its decision to change course. And that's significant here because DEC itself knew that the application it had in front of it was inadequate to determine that the project would assure compliance with the water quality standards. I hear you talking about this as a notice and comment problem as well, as the hard clam density. I'm going to just call it the hard clam density problem, right? But I want you to address the interplay of those two because I know you make them as separate arguments, that the contingent nature of the agreements that are included in the permit means that the public didn't get to weigh in on sort of a final version. And then you couple that with the fact that there was a lack of public notice and comment available on the dramatic, what, like 95% reduction in the estimate of the hard clam density in the area. Can you just talk about how those two, if it is your view, that they work together? Absolutely. Because at the end of the day, there's a lot going on here that seems like it didn't get publicly aired. That is correct. So what happened here was the agency accepted information both about the hard clam density and about the sediment loss rate after the close of the public comment period. And in its decision, in the water quality certification and in its responsiveness document, it talks about all of that new information and then identifies things that will need to happen as a result of having changed this position. So for example, it talks about the change in the hard clam density and says, well, we're going to have to have a plan to mitigate the unavoidable impacts. And on the dredge management plan, we now have reliance on a much less conservative sediment dispersion rate, which of course is impacted by the rate of dredging. So those two are very well connected because not only did the public have an opportunity to comment on the appropriateness of the 5% sediment displacement, they also didn't have an opportunity to comment on whatever plan might address any concerns arising out of the dredging. And so if one goes back to the body of case law, again, both under the Clean Water Act and under other administrative agency cases, the question is always in terms of assessing the adequacy of the public participation. Did the public have the information it needed to be able to meaningfully assess what was happening in the application and the information that the agency ultimately relied on? And if one looks at Ohio Valley or at Marsh or at Waterkeeper, in any of those cases, at Nova Scotia, the determination was no, that because the agency made a decision relying on post-comment submissions, it could not make the reasonable determination. I mean, that's sort of a weird approach, right? I mean, the whole point of getting public comment is that it might prompt the agency to get additional information from the company, right? When we do notice and comment, we get critiques of the application. The agency might require more information from the applicant. And the idea that the public comment has to occur once the agency has all of the information on which it's going to make its decision sort of suggests either that the public can't have input at the outset of review of the application or that you need to have just multiple rounds of public comments. And then at some point, you have to actually accomplish the thing, right? That is absolutely correct. And petitioners do not suggest that every time there is a submission of information that you need to have another public comment period. What we're saying here is that the essential information on which the agency relied, they initially recall that they could not approve a mixing zone because of concerns about the sediment dispersion and because of concerns about the hard clam. This time, they were able to approve a mixing zone because of the new information. And the approval of the mixing zone was what allowed them to reach a determination that the project would comply. So why shouldn't we think about it this way? I mean, there was an opportunity for the public to comment on the key issues, which is the effect on the hard clam population, the sediment loss rate from the dredging, and what's the third one? The burial depth of the pipeline. Oh, yeah, the burial depth of the pipeline, exactly. So all of those issues were teed up for public comment. The public could comment on what it thought was necessary to address those questions. And the agency and, you know, what's the equivalent of what would be like the final rule under the EPA, this isn't the EPA, but the final application, like explains, you know, how it's addressed all of those issues. So that means that the public has participated in all of the questions. Everything the agency did is a logical outgrowth of what was in the original application. I mean, it doesn't seem like that means that the public didn't have a meaningful opportunity to participate. I agree that if the agency came up with something that just, you know, you wouldn't have known to comment on at the application stage, maybe that would be different. But that doesn't seem to be this case. Respectfully, Your Honor, I disagree with that reading of the record, particularly with, well, with two of the three issues. First of all, the hard clam data that was in the original 2016 BEMFIC study, that was part of the final environmental impact statement that FERC issued. FERC said at the time that the density was 69.6 clams per square foot. TRANSCO then used that number in multiple applications over the course of nearly 10 years. DEC used that density number in 2017 and 2018 and 2019. There was no reason for the public to have any question about the validity. There was, actually, because the underlying data showed that that was just the wrong number, right? So, Your Honor, if one looks at the 2016 BEMFIC study from which that was drawn, it is multiple, multiple, multiple pages of various species listed at different VibroCore sample sites. It is unrealistic to expect members of the public to have borrowed through that underlying data when the agency itself— It would be unrealistic because, in fact, the agency itself and the company, it's like nobody noticed the mistake for a while. The agency didn't even know where to find it. The agency had to ask TRANSCO for that underlying data. And then with—and recall also that the agency used that number in rejecting this application several times. Then again, when one turns to the 5 percent— But what's the relevance of that? You're saying— Even though the question of the impact on hard clams was teed up for public comment and the public could comment on it, the fact that they later revised the data to correct what they thought was a mistake in interpreting the density numbers means that they had to reopen public comment? Your Honor, the public relied on the 69.6 for many, many years. And as a result—so let me back up for a second. In the draft environmental impact statement and the scoping process, there were some concerns about the BEMFIC study that was done, whether or not there was enough study done, there were enough samples taken. And then in the FEIS, there was a determination of the density of hard clams that was consistent with other reporting at the time, and that's in the FEIS. As a result, nobody felt the need to hire experts, do their own study, because the conclusion in the FEIS and the conclusion on which the public was directed to reply in the state's notice of complete application. If I may, I realize that my time is running out. I have one final comment, but we'll hear from you in a little too. Okay, I just wanted to turn to the 5%. So in the earlier denials, DEC specifically rejected the 5%. And it said that it didn't have adequate information to be able to accept the 5% sediment rate. Yeah, but the comment it gave was, you know, we've seen other applications from other companies that are doing dredging activities, and they estimate it at 25% or 30%. So unless the transco here gives us justification for why it has a lower one, we can't really accept it, right? No, Your Honor, that's not what they said. They just rejected the 5% modeling in the 2020 application. And when the 2025 application was submitted, there was no information in there that suggested that there was anything different. If at that moment, if when the application was determined to be complete, there had been information that gave the public notice that the agency might have a basis on which to change a position it had taken previously, we might be looking at a different situation. But here, the only indication that the agency was considering the 5% estimate was in the water quality certification when it was issued. Before you sit down, can I just ask you about the scope of review that we apply here, and in particular the arbitrary and capricious standard? Does Islander Eastern Pacific Company specify that the APA's arbitrary and capricious standard apply? And if so, why should we be assuming we're applying the APA standard as opposed to state standard for arbitrary and capricious? So Islander East does refer to the APA standard for arbitrary and capricious. And the reason is that it is a federal program. 401 is part of the Clean Water Act, and states are directed to execute it, but they're directed to execute it in coordination or in alignment with the Clean Water Act. In Riverkeeper v. Segos, a New York State case and other cases recognize that it is the state's execution of the federal Clean Water Act. If we're looking at, though, the interpretation of state laws and regulations implementing federal law, why wouldn't ERIE point us to state law there? Because we're looking at state regulations that are implementing a federal program, and other courts that have looked at this have used the arbitrary and capricious standard. There's a Fourth Circuit case. I'm sorry, I'm not recalling the name. I guess what I'm getting to is that arbitrary and capricious under state law is different than under New York law. Under New York law, it's considerably more deferential than under the APA. So what I'm just trying to understand is why are you saying we look at the APA rather than New York State? Because Islander East is this court's determination about that, and that has been the standard that's applied in other 401 cases in New York as well. And the statute under which petitioners are bringing this case, again, is the Natural Gas Act, which is a federal statute, and the concerns about public participation are under 1251, which is also part of the Clean Water Act. And in any event, we would argue that the failure to make available the meaningful information in accordance with what the agency has done in Oswego and global and in other cases renders it arbitrary and capricious under the state standard as well. So can I ask about it? So just applying that standard. So you're sort of saying the agency had an explanation, but it just didn't open it to public comment. So putting aside the public comment question, the agency had awareness that to the extent that changing a position is changing, it explained its departure from the prior determination. Did it rely on factors which Congress said it shouldn't consider? Did it fail to consider an important aspect of the problem? Did it offer an explanation that runs counter to the agency or before the agency? What's the like factor of the arbitrary and capricious standard that we think it failed to meet? So it failed to consider public input as required by 1251 because it didn't... It didn't respond to the comments that it got. You're just saying it should have had comments at a later stage. It didn't allow for public participation in... Okay, but that's a different thing about public notice. Okay. So if I'm just applying the actual arbitrary and capricious standard on the...  Yeah, exactly. So, Your Honor, we would argue as we did in our briefing that the explanation is arbitrary and capricious because it did not have the evidence in the record to be able to determine that the project would assure compliance. It punted that to the future plans. It didn't have the evidence required. The evidence on all the issues or is there some particular... What's the illustration of they reached a determination that was not supported by the evidence? Well, they reached a determination that they could assure compliance with the water quality standards without knowing whether in fact they could because they deferred all of that consideration to later for the plans that DEC would submit at some future date. I'm sorry, that TRANSCO would submit at some future date. They also didn't explain why... The hard clam information and the sediment rate, there was no independent evaluation by DEC as to the accuracy, as to whether there were other projects, other than projects that TRANSCO's own modelers worked on, had different estimates. And the memo, the way... The funny thing about that is the basis for rejecting it the last time seemed to also rely on the numbers. They took for granted the 69.9 and then the applicant walked them through why the underlying data actually leads to a different number. And they said, oh, okay, well, that makes it different. And in terms of thinking that the sediment loss rate was going to be 25 or 30 percent, that was based on what other companies had represented in other applications. And then TRANSCO here said, well, now we've seen how it actually turned out in those other cases and it was much less. I mean, that's an explanation for why... And again, it didn't actually wrestle with the contradictory facts that underlie the initial approvals. And it didn't do that because DEC didn't do it itself. And importantly, it didn't do that... When we apply the arbitrary and capricious standard, I mean, what we would normally do, you know, even in an APA case, which I suppose this is not, but we would say the agency has to be aware of a change in position and explain the reasons, right? Right. And we would argue that the explanation is arbitrary and capricious for its failure to fully explain the contradictions in the data. And because there was no public availability of the information on which they relied. And therefore, they didn't have all of the relevant factors and motor vehicles and Nova Scotia to make a decision because they withheld that information from the public and therefore cut off the amount of information that was accessible for its review. But it was a pretty clear explanation. DEC staff has evaluated the raw data Transco relied upon in making this conclusion about clam density and has confirmed its accuracy. And then you have the supplemental submission, which in fact does provide support for that conclusion and also that the prior calculation was wrong. What more needed to be said? What more needed to be said was for the public to have an opportunity to weigh in on that information and for DEC to... There's one page in the record in which one of the shellfish experts in handwriting calculates the average based on the numbers that are in front of them. Not suggesting that that's not accurate, but there was no other independent investigation. There was no assessment. There was a 2016 Benthic study. There was a conclusion drawn from that that was relied on for years and years and years. And then it was changed. And there was no question and no investigation about whether anything else was changed. There was no opportunity for the public to learn that there had been that change and address those concerns and address any other contradictory facts that might have rendered the conclusion arbitrary. Okay. Thank you very much, Ms. Cramble. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the first appellee, Mr. Lucidman. Good morning, Your Honors. May it please the Court, Brian Lucidman with the Office of the Attorney General, representing respondents, Department of Environmental Conservation. The Department's 2025 Water Quality Certification includes 57 project-specific and 11 general conditions to ensure that the Nessie Pipeline will meet water quality standards before, during, and after construction. The certification sets forth specific limits on the concentration of a dozen pollutants permitted during construction of the entire pipeline. To ensure those limits are met, the certification requires TRANSCO to use environmentally protective construction methods and to monitor water quality. After construction is complete, TRANSCO must monitor the entire right-of-way for five years to ensure the recovery of the environment and must pay compensatory mitigation for any harms caused. Because the Department complied with its statutory and procedural obligations under Section 401 of the Clean Water Act and state law, the petition should be denied. I'll start by talking a little bit about this dredge management plan. Petitioners have made the assertion that this doesn't require approval by the Department, and that's just incorrect. On page 13 of the record, the cover letter to the permit makes clear that the dredge management plan, quote, which will be subject to NYSECE approval, end quote, and then goes on to describe. Is that appendix 13? Is that what you're directing? That is, yeah, that is joint appendix page 13 is the cover letter. There's also a general condition 8 in the permit, which is on page 46 of the record, and that says that basically all the approved plans would become part of the permit conditions. And additionally, TRANSCO has submitted a draft plan for DEC approval, so the only ones who are confused about this requirement seem to be petitioners. So if TRANSCO submitted, and we'll stick with dredge management, a description of the methods, equipment, procedures it's going to use to dredge, and DEC didn't think they were adequate, they've already issued the permit. Couldn't DEC then expose itself? If it puts a stop to it, couldn't it expose itself to litigation from TRANSCO? Is it realistic that DEC is going to say, actually, we don't really like this plan? There is always a risk of that, and that would end up being a fight between TRANSCO and DEC, but the certification itself sets forth very detailed requirements for this dredge management plan, including condition 41. It requires the use of what's called an environmental clamshell bucket. It means it's not just a traditional excavator. It's like a clamshell that's inside of another surface so that the sediments don't get stirred up. And using that method actually has a lower sediment loss rate than using the jet trenching technique, which itself is actually a non-dredging technique, but is— But, of course, it's inevitable that you might have some kind of subsequent controversy, right? So even if you had laid out all the requirements of every possible plan and compliance measure, it might be that the agency thinks that TRANSCO is not abiding by some requirement, and TRANSCO thinks it is, and there will be some kind of dispute in the middle of the project, right? That's always a possibility, and in fact— So there's always going to be something that is going—like, you know, you have to— Once you implement the project, there still are going to be ongoing monitoring and requirements and disputes. Yes, that's the nature of this regulatory environment, and one of the certification requirements requires TRANSCO to hire an independent environmental monitor who will be on site at all times and have the authority to stop work in the event that environmental damage is being caused or there are exceedances of water quality standard. So that is built right into the certification. We think about the compliance plans. So just from reading the record, it kind of seemed to me that the agency was saying, well, here are all the parameters, and we think that the project is approvable and will be consistent with water quality standards, and the compliance plans were sort of extra safeguards to make sure that nothing unexpected happened, that, like, you're using the best equipment, like, somebody's monitoring at all times to make sure that you're complying and whatever. But that is a safeguard to make sure it stays within the expected parameters based on, you know, what's in the approval. Is that—do you think that that's an accurate characterization? That's correct, Your Honor. My client has described it as, like, a boots-and-suspenders approach. You know, the limits—these specific numerical limits are fundamentally what TRANSCO has to meet, and everything else in the certification is essentially designed to ensure that those limits are met. And so for the compliance plan—I mean, so if you thought that the compliance plan was essential to the approval and you couldn't lay out in advance exactly what would be in it, then you might say, well, then maybe we couldn't approve the project before we laid it out, right? Correct, Your Honor. If we couldn't get some of the details, if we didn't know— if they wouldn't tell us what construction techniques they're going to be using, but their application made very clear where they're going to be using these environmental buckets, where they're going to be using jet trunching, and the certification includes those requirements. And basically each of these plans has various guideposts, various requirements that TRANSCO must comply with, and they're essentially being asked to fill in the details. Who are you going to hire to do this? Where exactly are you going to be testing water quality? Those sorts of things that can't always be worked out in advance. I want to talk a little bit about— And then there's that additional point about being worked out in advance, because the extent that it's asking for specific information about the project, if you require them to tell you who exactly you're hiring and what exact equipment you're using like a year in advance before the thing is approved, you might not be able to hire the same person. Correct, Your Honor. And the department's also, in these 401 certifications, working under a very strict time limit that if the department doesn't meet that time limit, then this project gets constructed without a water quality certification at all, and that's an outcome that nobody wants here. Do you want to talk about this hard claim? That also might explain why it is that there's rejection and then an acceptance as opposed to just an ongoing process where you ask for more information, right? Because you have a one-year deadline, and you have to make a decision by the deadline. So instead of saying, we're not ready to make a decision, we want more information from the company, you say, well, we're going to deny that prejudice so that we can give an answer within one year. But the premise of that is that they could come back with more information. Correct, Your Honor. If this was a state permit or virtually any other permit, the department would have just asked Transco to agree to more time, but this court in the 2021 version DECUV FERC case held that even if the applicant agrees to extend the deadline. Well, we said that, but Congress sort of said that too. Exactly, Your Honor. This court has rejected that argument on our part in the past, and so our safest option is to just deny without prejudice, and then that allows them to reapply. Right. So in the previous denial, you know, a lot of it seems like the agency said, well, we're not ready to approve it without more explanation, but because we can't, you know, keep going, we're going to deny it without prejudice.  The information before the agency at that time required a denial. Additional information came in and allowed the department to approve the project. So your opponents say that when the new hard clam and sediment numbers came in that DEC, I guess sort of like it did with the 69 point whatever number originally, just accepted the three point something number. Was there independent analysis? How did that work? I have a couple of responses to that, Your Honor. The first is this error in the calculation came up in the context of discussing the mitigation costs, and this is the recognition that whatever technique you're using, there are going to be some clams that are in the right-of-way that are going to be killed by this project, and you need to provide compensatory mitigation for that. Maybe I should ask this threshold question then. Does DEC dispute that the hard clam number was a significant factor in the prior denials? I do dispute that factor, Your Honor. Yes, and the reason is because whether the number is 69.6 or 3.7 or some other number, DEC considers this a critical environmental resource. They recognize that this is one of the few remaining productive hard clam beds in the state. But it's no longer, when it drops from 69 to 3, one of the most productive in the state, right? Because that language is in those initial denials, and it makes it feel like that was a decisive factor, and when you go from 69 to 3, I'm presuming it's no longer one of the most productive remaining hard clam beds in the state. It's still considered a critical resource to the state, and again, this hard clam density is not listed in the water quality certification at all. It comes up in the response to comments and in the context of, again, mitigation costs, and basically if there's fewer clams in this right-of-way, then the mitigation costs for Transco are going to be less. What are the other changes from 2020 to 2025 that mean that you think that there isn't a problem? Is it the seasonal stoppage of the dredging activities? Yes, so with respect to the mixing zone, the department obtained some clarifications about the modeling to ensure that water quality standards would be met at the edge of that 500-foot mixing zone, and the department on its own essentially came up with this June and July time of year restriction that is not ... I'm trying to remember the language, but essentially there's no way around it. They just cannot have construction activities during June and July. They're going to stop all sediment-disturbing activities within the hard clam area from June 1st to July 31st. Correct, Your Honor, yep, and with that in place, the department's research showed that adult hard clams are actually quite resistant to suspended sediments and to other impacts from this project. They can be buried in up to 15 centimeters of sediment, and this project's only expected to create about 3 centimeters of sediment at maximum. They can be exposed to elevated levels of sediment for days at a time. This project's expected to have the sediment settle out, in most cases in half an hour or less, at a maximum of about eight hours. The department determined that the adult clams are probably going to survive this pretty well, but the larval clams are more sensitive, so when they're propagating in June and July, we're going to have a strict limitation on construction activities in the vicinity of these hard clams. What is the explanation, though, for the massive error in clam density between 1969 and 2003? How did it get so wrong? It appears to have been a mathematical error. Again, the sampling data has remained the same. DEC actually asked Transco to post the raw data on the FERC public docket, and so that's been available for a while now. But somebody in doing the math, apparently, made a 20-fold error in the calculation, and Ms. Hennessey may have additional information about that. But at some point during the FERC environmental review is when this occurred. But again, to the department, it's actually not critical to their decision here, because either way it's considered a critical environmental resource. It just has to do with the cost of the mitigation at the end of the project. But again, it is still a decisive factor. So we've got the hard clam density factor, which the DEC says, with the revision to that number, we now approve, right? And we've got the two-month suspension of any activity that would affect them. Judge Menasci is asking, what has changed? So those are two changes. What else has changed? The four-foot burial depth was another factor. And this had to do with the DEC typically requires six-feet burial depth, but that is generally for transmission lines, electrical transmission lines that generate an electromagnetic field. That's not the case here. Additionally, digging the trench six-feet deep instead of four-feet deep is going to have more turbidity, more of the sediment being stirred up by the project. So there will actually be increased environmental damage from the six-foot burial depth. And that was another factor the department relied on. So the depth changed from six-feet in the prior applications to four-feet in the current applications? No, no. Transco has always proposed to do it at four-feet. Okay, so what's the change? In 2020, the department said we need more information about why a four-foot burial depth is appropriate. And in 2025, that justification was provided. You can see that on pages 766 and 767 of the records. Right, so it's a similar thing. It's like you weren't prepared to approve a four-foot burial depth, but then in the new application they came back with six-feet is necessary when it's electricity because of radiation, but that's not a problem here. The Transco has experience with doing four-foot burial depths in other areas. Six-feet would create additional sediment loss. And what else? The frequency of fishing at the bottom of the bay. Correct, Your Honor. There's very limited fishing here. Most fishing activities are actually prohibited in this section of the bay, so there's very limited risk of any kind of entanglement of fishing equipment in the pipeline, even with that slightly lower burial depth. And then the last factor was that change. I don't even know that to say that it changed, but that the department received more information on was this 5% sediment loss rate. And just an additional, again, boots-and-suspenders approach here. The jet trencher, under Condition 44 of the permit, they're going to do trials, testing, to confirm the total suspended sediment will meet the permit standards before they even go out and start doing the construction. So that's just, again, additional security to make sure that this project complies with water quality standards. So is this correct? My understanding of the record was that in the prior application, the agency thought that 5% was not credible because other applications had said that jet trenching would lead to a 25% or 30% sediment loss rate, and that this time Transco said, Well, we now have experience with those projects, and it turned out that that was an overestimate given what actually happened. Is that right? Correct, Your Honor. There was one case Transco provided where the estimated rate was 25%, and the observed conditions were 100 times less than that. You can see that on pages 810 and 811, page 917 of the record. So, again, these models were generating very... were using very high predicted sediment loss rates, but those were not observed in trial runs. Okay, what about the public participation question? So to the extent that some of these explanations came out after the comment period, why wouldn't it be the case that the public should have an opportunity to comment on them? So I have a couple of answers to that as well, Your Honor, and the first is that petitioners have never alleged what they would have said if they had the opportunity to comment or how that would have affected the department's decision here. Under the APA, which we agree provides a standard for review in this case, a party needs to be prejudiced by a violation before they can enforce it in court. Well, I don't know about that. I mean, if we have a notice and comment requirement, if the agency just dispenses with it, I don't know if you have to show that somebody would have said something that would have made a difference, right? But I guess your position here would be, actually, we didn't violate the actual requirements. Like, the argument they're making is about sort of the spirit of public comment. Yes, and that would be my second point, is that they don't allege we've failed to follow our state procedures. In effect, they're saying that the state procedures don't provide enough opportunity for public comment, but they've not challenged those regulations anywhere. I believe Ms. Crim just said, you know, to the extent that this is an implementation of the Clean Water Act, so to the extent that the state regulations are inadequate, they would be unlawful, right? I guess you're right to make a precise argument about the degree. But, like, the suggestion would be that, well, if it doesn't allow for meaningful public participation in what's crucial to the approval, then maybe it's inconsistent with the federal requirements. What about that? Well, the threshold matter I'd say is that there was a meaningful opportunity for public comment here. The application sets forth the vast majority of the details of how this project is going to be built and what's going to happen. The few specific things that they criticize us for not giving public comment on, again, they've never said what they would have said about that or how that possibly could have affected the outcome. There's a very important distinction here between Section 401 and other parts of the Clean Water Act, which is that Section 402, Section 404, some of these other sections, establish what's called like a delegated authority for the state, which means the state's actually acting under the federal Clean Water Act. Whereas Section 401's a little different. It actually preserves preexisting state authority over state water quality. And courts have consistently agreed that state administrative procedures apply to Section 401 water quality certifications. Okay. Well, thank you very much. If we have time for questions. Thank you very much. We'll turn to the other affilee, Ms. Hennessey. Good morning. May it please the Court. Yvonne Hennessey for Respondent Transcontinental Gas Pipeline Company. Your Honor, while I was sitting here listening, I think I have an interesting perspective. I've been involved representing the company on this specific project since it was first proposed in 2002. And I worked on the prior permitting that ultimately led to the 2020 denial, as well as the more recent permitting in 2025, and all of the work that we did with the department to get to the water quality certificate before you. And so what I can say without doubt is we were going to be here no matter what DEC, no matter when they went to public comment, no matter what the explanation was, no matter what the data was. But Petitioner's argument really rests on numerous, numerous inaccuracies and misrepresentations of their record. So I have a little bit of time here. I'm going to focus on some of the things that we talked about today. So let's talk about the clam density number. I heard earlier today by Petitioner that that number was everywhere and it was relied upon everywhere. It's located on one page in the FEIS that was prepared by FERC. And I wish I had a great explanation for where the miscalculation occurred, but the actual underlying data, there's also a stack of data that supports it, as we heard from Petitioner's counsel. There's also a summary table that summarized it. That summary table and the data was filed in FERC in 2017, all of it, under Resource Report 3. It has been filed with the Department of Conservation not once, not twice, not three times, now four times. Two of those times, all of the data went out to public comment. Now I heard Petitioner say we had no reason to know we should evaluate the data. But we still don't know what's wrong with it, even though on September 24th in the FERC docket, Transco filed the correction to explain it FERC. And that notice said we were doing it at the request of the Department of Environmental Conservation. And sitting here today, at best we have, well we might have challenged it, there might be something wrong with it. But there is nothing wrong with it, because the Department of Environmental Conservation actually verified the accuracy. There are two pages in the record, I believe it is A1108 through A1109, where the technical expert in DEC looked at that data and confirmed that it was accurate. And I would just say, off the cuff, 69.6 actually doesn't even make sense if you were to check GPT what normal claim density would be. Well, that's an odd thing for you to say, given that you're the person who proceeded with the prior application with that number, right? It was not in the application. But it was part of the data that was then issued. It was one of the bases for the denial. DEC just conceded that it was a basis. And we know in the new approval it says, with the change to the hard claim density data, it was clearly relevant. Well, I respectfully disagree. At first I think... What does that mean then? So if you go to the 2020 denial, I will admit that it references 69.6, but it was in reference to other issues with respect to the denial. But in the current approval, what does that statement mean then? In the approval it says, with the change to the hard claim density data, we hereby approve. Your Honor, that's not what the approval says. So I would go back to... I guess you're... Is this right? You're saying we didn't really notice it because it wasn't that important to the application. Correct. And I think that the State actually just said that it was not a basis for the approval of that application. It was relevant to mitigation costs. But regardless of the claim density, the State regards this as a sensitive area, and so they would require the same mitigation measures regardless. Yes. And it's not just us saying it up here. The record fully supports that. So first of all, claim density is not mentioned in the Water Quality Certificate. It is mentioned in the cover letter on footnote 6 only with respect to mitigation. You have in the record an Excel spreadsheet showing the mitigation numbers from 69.6 to 3.7. The only place it's a basis for the denial is on page 21 of 22 of the response to comments where it's mentioned in passing. This was not a basis for the denial. In fact, the only time this came up... Even if it were, I mean, part of the point of public comment is for the public to scrutinize the proposal. And so, I mean, the public may or may not be inclined to evaluate whether the claim density data is accurate or accurate conclusions are drawn from it. But that's the function of public comment, right? Correct. Like it's not that the public gets a veto on the policy. It's that we get input from the public on the basis for the policy and the inputs. Correct. And there was significant public comment three times for the Department of Environmental Conservation on this project, including 45 days, which is more than our uniform procedures require in New York. And I do want to talk a little bit about the public notice piece. So if you look at the state regulations, which petitioners acknowledge in their brief, is the guiding principle for how DEC has implemented its requirements. So that's part 621, and there are portions of it in the appendix here. We have 621.2 that defines completeness, and I believe Your Honor referenced them before. It's not everything the department may rely upon, but it includes information that is sufficient to go out to public comment, although the department reserves the right to ask for additional information. But even that material that went out on July 2nd was not the exact same set of materials as of the time of the denial in 2020, which, to Your Honor's point, was right at the one-year mark when they had issued that denial. It was, I believe, May 15th of 2019 to May 12th of 2020, if my dates are correct. But we also have in our uniform procedures that part 621.3 that lays out in detail what the general requirements are for completion. And we've not heard one argument as to how that wasn't complied with here. In fact, after we submitted the application as it existed at the time of the denial in May of 2025, there was then additional supplementation of the record to make sure that we had checked off all those boxes. So what about the suggestion that, well, maybe there wasn't a violation of the New York State requirements, but maybe the federal law requires New York State to have different requirements by having more public comment? Your Honor, I believe the case law that they cite in the Provision 1251E focuses more on, first of all, as my co-respondent indicated, this is a different section of the Clean Water Act, but those are all general policy regulations of fluid limitations, things of that sort. That is not the case here. They don't cite one single case where it was a permitting decision under Section 401 of the Clean Water Act. And I believe that's a distinction that matters here. They're asking not for public comment on what a fluid limitation may be, but comment on perhaps additional data on what the judge management might be. But isn't what happened here at the very least circumventing the whole purpose of the notice and comment process? You have an application submitted that triggered extensive comment and then was supplemented with a lot of important information, but that supplement was never subject to notice and comment. Isn't that the whole purpose of having this process? I disagree that it was supplemented with significant important information. As I said, the CLAM data had been there all along. The application materials in front of DEC had been subject to comment, and they were also subject to comment during the FERC process. The other issue that we talked about here is the 5% settlement rate loss and the memorandum that was submitted August 2025. That is not specific to this project. That is just, quote, further evidence, which was what was noted in the 2020 denial as necessary, of three other projects. Yes, it was the same modeler, but what that report did is it took our modeler and said, typically this is how overly conservative it is based on specific projects that had happened. A wind project, two transmission lines, one of which the Champlain-Hudson is a New York project. There is a lot more information in the record. In fact, if you read the cover letter and you read the response to comments, one of the changes that we haven't recognized here today is that there was a long passage of time from 2020 to 2025, and as the department itself acknowledged, they gained a lot of knowledge at that point because of the in-water construction that had occurred. There was a lot of offshore wind projects proposed, transmission lines, et cetera. I get these details, but just to like sort of focus more directly on the suggestion that, you know, is there circumvention of the public notice requirements? The idea of the public notice requirement is to treat the public as a stakeholder in the agency's review of the application, right? So when the application comes in and it's complete, in addition to the agency reviewing by getting responses from the applicant to its inquiries, like it allows the public to also say, well, we have questions about it and we think, you know, these questions should be asked and answered and so on, right? That's the idea. Like the public gets involved in the review of the application. It's not that the public gets to decide whether to approve it or not. It's not like a referendum, right? It's a chance to comment on an application. The statute says you provide public notice of the application. The statute does say that. And honestly, the purpose of the public comment is to allow the department to take into that consideration to see if there's any more information that they need to request, which exactly might be. You wouldn't disagree. I mean, so in the APA context, again, you know, I don't know if it directly applies here because this is not the APA, like to the extent that between the time they issue a notice of proposed rulemaking and take public comment, if the final rule goes off on some, you know, some tangent that we say is not even a logical outgrowth of what the proposed rule was, then maybe you need to reopen public comment. But as long as you're focused on the same issues that the public had a chance to comment on, it doesn't require a new round. Absolutely. And petitioners have cited that exact case law when there's rulemaking and then the underlying rationale was one thing and then all of a sudden it changed. That's not the case here. This was just additional information to support. The project itself, it's still the same route, et cetera. There were definite changes in terms of project schedule to address the June-July construction prohibition that was imposed to protect the heart clams. There was conditions on environmental best management. So shutting down the dredging in June and July seems like a pretty simple thing. Is the reason why that wasn't raised in the 2020 application just because they were up against the deadline and so nobody had a chance to say, like, you know, this is how we can mitigate this problem? I will tell you it is actually not a simple thing. I actually have our client here today. I can't tell you the amount of effort we put because it's such a specific process to put your project to schedule together in terms of when you do it. Oh, I see. So actually because of all of the equipment, it might be pretty complicated to stop for two months. So you'd have to figure out whether it's feasible. Yes. So it was not an easy process. Can I ask you about the interplay between the FERC permit and the DEC permit? My recollection is that in the 2018 denial, the first denial at least, or I guess it was a 2019 denial, the 2018 application, but the first denial.  One of the comments in DEC's denial was, and by the way, FERC hasn't issued a permit, which sort of suggests that DEC thought of it as a prerequisite. That's not clear to me from the statute that one or the other has to go first. But I understand that there's a challenge pending the D.C. Circuit to the FERC approval of the same project. So how should we deal as a court with the interplay of those two? Do we need to wait and find out if the FERC permit is going to be upheld? Absolutely do not need to wait. And honest, we're confident that they're going to succeed in the D.C. Circuit. But putting that aside, the one thing that the DEC does require is that the environmental review has been completed at the federal level so that they can make their determination. Because under our State Environmental Quality Review Act, it's preempted under the Natural Gas Act. So they need to make sure that there's an adequate federal review to rely upon in making their determination. So it's the review that matters, not the outcome of the review? No, DEC still has an obligation to decide an application for what it is. The prerequisite in the FERC side for DEC to act is the review itself by the federal authorities as opposed to the issuance of the approval under FERC? Yes, it's the environmental review. So even if that certificate is, if the D.C. Circuit says we're sending it back or that certificate's not valid, the FERC certification, DEC can go, well, DEC could approve it, but the project couldn't go forward? Is that where we would be? We would not be able to start construction.  But there's no, neither court should wait for the other as your position? Absolutely, and I think petitioners ask for expedited treatment of this decision, so. I see my time is out. Thank you very much, Ms. Hennessey. We'll turn back to Ms. Cram on Rabat. Briefly, Your Honors, thank you. I think it's really important to take a step back and recognize what happened here. In 2019 and in 2020, the agency denied the 401 certification. It found that the project could not comply with its water quality standards, and it found that based on a number of issues. It found that it could not accept. Yeah, I mean, the agency just was up here saying we just, when we reached the one-year deadline, we couldn't approve it. It's not that we determined it was not possible to approve it. It's that we didn't have enough information to approve it, and that's why we denied it without prejudice. And, Your Honor, that's a post hoc rationalization that's not acceptable on this record. That is not what they said in the decision. So how do I know that? I mean, I thought the record said all sorts of things like, in the absence of additional explanation from Transco, we can't accept this number. Like, we need, you know, more, you know, information about the basis of the estimate and so on. And the record also said that it could not approve this because of the impact on the hard plans and because they couldn't accept the sediment rate. And so they identified for themselves the critical issues in determining whether a mixing zone was appropriate. And then when the application came back and they put the application out for public comment, there was no additional information in the record they gave to the public that indicated that there had been any change in any of that information. And despite what Respondents Council has said, the FEIS, with the 69.6%, was part of Transco's application to DEC. The joint application included the final environmental impact statement from FERC. The idea that the clam discussion only came up in the context of mitigation, there's two things I want to say about that quickly. First of all, that's not reflected in the record. is a letter and a response to a request for additional information that says, we were wrong, we don't know why. DEC says, please tell FERC that. And then DEC goes ahead and approves this project and concludes, as a threshold matter, that the change in clams allows it to reach a different conclusion. Do you think that 69.9 is the right number and that they're wrong about the new estimate? Your Honor, we do not dispute the arithmetic on the underlying data that Ms. Barnes calculated in the record. So then what's the significance of this? So if, in fact, it was a miscalculation and now they have the accurate number, why is that a reason to invalidate the certification on the ground that now they did the math correctly as opposed to incorrectly? No, but you can invalidate the certification on the basis that the public was denied the opportunity to comment on information. What would the public say about it? We might have done our own study. We would have hired experts to look at the BEMFIC survey that was done and conclude that they only sampled in a three-month period. They only sampled in a limited area. We do not contest the math. We do not contest the math. A couple other quick questions, quick comments before we sit down. It is not, I'm afraid, that petitioners are confused about the requirement of the judge management. It's that DEC's documents conflict with each other. On page 37 of the Water Quality Certification, which is the actual permit that applies and is enforceable, it says that TRANSCO shall submit to DEC. It does not say submit for their review and approval. It does talk about review and approval in other places, but not in the Water Quality Certification itself in the same way that it does with some of the other plans. Just going back to mitigation, whether or not the discussion about the clams came up in the context of mitigation, you don't get to mitigation until there's a determination that there are reasonable assurances that the project will comply with water quality standards. Without the change in clam density and without the details of the plans that were deferred, the agency was arbitrary and capricious in determining and did not have substantial evidence in the record in determining that it could approve this project. Okay. Thank you very much, Ms. Cram. The case is submitted. We will hear argument next in Case No. 2527-25, Condipalli v. Director of the United States Citizenship and Immigration Services. Let's just wait for everybody to shuffle out of the room. Almost.